1

2

3

4

UNITED STATES DISTRICT COURT

5

DISTRICT OF NEVADA

6

PATRICIA L. WENDLAND,

3:13-cv-00703-LRH-WGC

7

Plaintiff,

**REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE**

8

v.

9

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security Administration,

10

11

Defendant.

12

        This Report and Recommendation is made to the Honorable Larry R. Hicks, Senior

13

United States District Judge. The action was referred to the undersigned Magistrate Judge

14

pursuant to 28 U.S.C.§ 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the

15

court is Plaintiff Carla Theis's Motion for Remand and/or Reversal. (Doc. # 13.)[1] Defendant

16

Commissioner filed a Cross-Motion to Affirm and Response to Plaintiff's Motion for Reversal.

17

(Docs. # 14, # 15.)[2] Plaintiff filed a reply. (Doc. # 16) After a thorough review, the court

18

recommends that Plaintiff's motion be denied, and that the Commissioner's cross-motion be

19

granted.

20

**I. BACKGROUND**

21

        On April 5, 2011, Plaintiff filed an application for supplemental security income (SSI)

22

under Title XVI of the Social Security Act. (Administrative Record (AR) 109-117.) Plaintiff

23

alleged she became disabled on June 14, 2008. (AR 109.) The Commissioner denied her

24

application initially and on reconsideration. (AR 51-54, 57-59.) Plaintiff made a timely request

25

for a hearing before an administrative law judge (ALJ) to challenge the Commissioner's

26

27

        [1] Refers to court's docket number. Unless otherwise indicated, all page number references are to the court's docketed page numbers.

28

        [2] These documents are identical.

determination, and on June 1, 2012, appeared with counsel and testified before the ALJ. (AR 24-47, 60-62.) Testimony was also given by a vocational expert (VE). (AR 42-46.) The ALJ followed the five-step sequential process for evaluating such claims, and issued a written decision on April 9, 2012, finding Plaintiff not disabled. (AR 14-22.) Plaintiff appealed and the Appeals Council denied review. (AR 1-3.)

Plaintiff now appeals the decision to the District Court. (Doc. # 13.) Plaintiff argues that the ALJ failed to articulate legally sufficient reasons for rejecting Plaintiff's symptom testimony. (Doc. # 13 at 8.) The ALJ found that Plaintiff's testimony regarding the frequency and intensity of her back pain, chest pain, and shortness of breath was disproportionate to the clinical and objective medical evidence in the record. (*Id*.) The ALJ also discredited Plaintiff's testimony regarding her hands because "x-rays were relatively normal, with no significant arthritic changes." (*Id*.) Plaintiff argues, however, that the ALJ's reasons for discrediting Plaintiff are not supported by substantial evidence in the record.

First, Plaintiff contends that the ALJ did not discuss Plaintiff's complaint of back pain, but instead focused on the results of her hand x-ray as the reason for discrediting her testimony, ignoring her testimony that she experiences daily pains that make it hard for her to walk, sit and write. (*Id*. at 8-9.)

Second, Plaintiff contends that while the ALJ described Plaintiff's hand x-ray as "relatively normal," Plaintiff has some arthritic changes in her thumb and forefinger which impact her ability to write. (*Id*. at 9.) Plaintiff maintains that this complaint is reasonably connected to the medical finding of some spurring in the index finger. (*Id*.) Plaintiff further argues that the ALJ cannot disregard Plaintiff's testimony simply because it was not substantiated by objective medical evidence, as the ALJ did here by stating that her complaints were "disproportionate to the clinical and medical evidence of record." (*Id*.)

As such, Plaintiff requests that the court reverse and award benefits to Plaintiff, or alternatively, remand for further proceedings. (*Id*. at 10.)

Conversely, the Commissioner argues that the ALJ's credibility was proper and is supported by substantial evidence in the record. (Docs. # 14/15.) Specifically, the Commissioner

contends that the ALJ properly cited to the following reasons for finding Plaintiff's testimony less than credible: Plaintiff's extensive subjective complaints were disproportionate to the mild clinical and objective medical evidence in the record; Plaintiff testified that she stopped working because she was laid off rather than for reasons related to disability; Plaintiff had a poor work history; Plaintiff's treating physician contradicted Plaintiff's allegations; and Plaintiff engaged in routine and conservative treatment. (*Id*. at 5.)

First, the Commissioner argues that while Plaintiff testified she was unable to work in part due to problems with her hands caused by arthritis, and while Plaintiff alleged disability beginning in 2008, x-rays of her hands in 2011 showed no significant arthritic changes. (*Id*.) With respect to Plaintiff's right hand, Plaintiff's primary care physician, Dr. Derek Mito, did find minimal spurring in the thumb and index finger, but the other joints appeared normal. (*Id*.) The Commissioner contends that the law requires a *severe* impairment, so whether the x-rays of her hand were "relatively normal" as the ALJ described them, or "not entirely normal" as Plaintiff maintains, the "minimal spurring" demonstrated by the x-ray does not support Plaintiff's complaint that she was severely impaired such that she could not work, in part, due to her debilitating arthritis in her hands. (*Id*.) In addition, the Commissioner contends that Plaintiff's argument about how these findings could affect her ability to use a writing instrument are misguided because Plaintiff does not show how either of the sample jobs identified by the VE (small products assembler and masker) would be affected by her ability to use a writing instrument. (*Id*. at 6.) The Commissioner acknowledges that lack of objective evidence supporting a claimant's symptoms cannot be the sole basis for discounting symptom testimony, but the ALJ may consider it as one factor in the credibility analysis. (*Id*.)

Second, the Commissioner asserts that Plaintiff testified that she stopped working in 2001 because she was laid off, not because she became unable to work due to disability, and this is a proper reason for discrediting Plaintiff's testimony. (*Id*, citing *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001)).

Third, the Commissioner also contends that the ALJ properly cited Plaintiff's poor work history as a basis for discrediting her testimony. (*Id*.) Plaintiff said she became disabled in 2008,

1    but the last time she worked was in 2001, and she provided no explanation for not working

2    during those seven years. (*Id.*, citing 20 C.F.R. § 416.929(a); *Thomas*, 278 F.3d at 959.)

3         Fourth, the Commissioner states that the ALJ properly discredited Plaintiff's testimony

4    because her treating physician contradicted her allegations. (*Id.* at 7.) Plaintiff alleged an

5    inability to work due in part to chest pain that she claimed to experience every day, but her

6    treating cardiologist, Dr. Theodore Berndt, performed his last examination in March 2011, and

7    indicated that despite Plaintiff's subjective complaints, she was asymptomatic and appeared "in

8    no acute distress." (*Id.*)

9         Fifth, the Commissioner points to the ALJ's consideration that Plaintiff engaged in

10   routine and conservative treatment as a valid basis for rejecting Plaintiff's testimony. (*Id.*) The

11   ALJ noted Dr. Mito's treatment consisted largely of symptomatic treatment of complaints of low

12   back pain, with no evidence she ever participated in physical therapy or was evaluated by a

13   specialist such as an orthopedist or neurologist. (*Id.*, citing *Tommasetti v. Astrue*, 533 F.3d 1035,

14   1039-40 (9th Cir. 2008); *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007); *Osenbrock v.*

15   *Apfel*, 240 F.3d 1157, 1166 (9th Cir. 2001).)

16        Finally, the Commissioner notes that in making his RFC finding, the ALJ gave great

17   weight to consultative examiner Dr. Steven Gerson, and State agency reviewing physicians

18   Dr. George Nickles and Dr. Mayenne Karelitz. (*Id.*)

19                                **II. STANDARD OF REVIEW**

20        The court must affirm the ALJ's determination if it is based on proper legal standards and

21   the findings are supported by substantial evidence in the record. *Gutierrez v. Comm'r Soc. Sec.*

22   *Admin.*, 740 F.3d 519, 522 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)). "Substantial evidence is

23   'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

24   reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez*, 740 F.3d at 523-

25   24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

26        To determine whether substantial evidence exists, the court must look at the record as a

27   whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*,

28   740 F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may

1  not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*,

2  759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

3  2007)). "'The ALJ is responsible for determining credibility, resolving conflicts in medical

4  testimony, and for resolving ambiguities.'" *Id*. (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039

5  (9th Cir. 1995)). "If the evidence can reasonably support either affirming or reversing, 'the

6  reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez*,

7  740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)). That being

8  said, "a decision supported by substantial evidence will still be set aside if the ALJ did not apply

9  proper legal standards." *Id*. (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222

10 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In addition, the court

11 will "review only the reasons provided by the ALJ in the disability determination and may not

12 affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citing

13 *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

14 ### III. DISCUSSION

15 **A. Disability and the Five-Step Sequential Process**

16       Under the Social Security Act, "disability" is the inability to engage "in any substantial

17 gainful activity by reason of any medically determinable physical or mental impairment which

18 can be expected to result in death or which has lasted or can be expected to last for a continuous

19 period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if:

20       [H]is physical or mental impairment or impairments are of such severity that he is
21       not only unable to do his previous work but cannot, considering his age,
         education, and work experience, engage in any other kind of substantial gainful
22       work which exists in the national economy, regardless of whether such work
         exists in the immediate area in which he lives, or whether a specific job vacancy
23       exists for him, or whether he would be hired if he applied for work. For purposes
         of the preceding sentence (with respect to any individual), 'work which exists in
24       the national economy' means work which exists in significant numbers either in
         the region where such individual lives or in several regions of the country.
25

26  42 U.S.C. § 1382c(a)(3)(B).

27       The Commissioner has established a five-step sequential process for determining whether

28 a person is disabled. 20 C.F.R. § 404.1520 and § 416.920; *see also Garrison,* 759 F.3d at 1010

(citing *Ludwig v. Astrue,* 681 F.3d 1047, 1048 n. 1 (9th Cir. 2012)). If at any step the Social Security Administration (SSA) can make a finding of disability or nondisability, a determination will be made and the SSA will not further review the claim. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). "'The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five.'" *Garrison*, 759 F.3d at 1011 (quoting *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009)).

In the first step, the Commissioner determines whether the claimant is engaged in "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied. 20 C.F.R. § 404.1520(a)(4)(i), (b); § 416.920(a)(4)(i); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

The second step requires the Commissioner to determine whether the claimant's impairment or a combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and § 416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. *Id*. Basic work activities are "the abilities and aptitudes necessary to do most jobs[,]" and include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521 and § 416.921. If a claimant's impairment is so slight that it causes no more than minimal functional limitations, the Commissioner will find that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii), (c) and § 416.920(a)(ii). If, however, the Commissioner finds that the claimant's impairment is severe, the Commissioner proceeds to step three. *Id*.

In the third step, the Commissioner looks at a number of specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the impairment meets or is the equivalent of one of the Listed Impairments. 20 C.F.R. § 404.1520(a)(4)(iii), (d) and § 416.920(a)(4)(iii), (c). The Commissioner presumes the Listed

Impairments are severe enough to preclude any gainful activity, regardless of age, education, or work experience. 20 C.F.R. § 404.1525(a). If the claimant's impairment meets or equals one of the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d), § 416.920(d). If the claimant's impairment is severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past relevant work is that which a claimant performed in the last fifteen years, which lasted long enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R. § 404.1565(a) and § 416.920(b)(1).

In making this determination, the Commissioner assesses the claimant's RFC and the physical and mental demands of the work previously performed. *See id.;* 20 C.F.R. § 404.1520(a)(4); *see also Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R. § 1545 and § 416.945. In determining RFC, the Commissioner must assess all evidence, including the claimant's and others' descriptions of limitations, and medical reports, to determine what capacity the claimant has for work despite the impairments. 20 C.F.R. § 404.1545(a) and § 416.945(a)(3).

A claimant can return to previous work if he or she can perform the "actual functional demands and job duties of a particular past relevant job" or "[t]he functional demands and job duties of the [past] occupation as generally required by employers throughout the national economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and citation omitted).

If the claimant can still do past relevant work, then he or she is not disabled for purposes of the Act. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131 ("Generally, a claimant who is physically and mentally capable of performing past relevant work is not disabled, whether or not he could actually obtain employment.").

If, however, the claimant cannot perform past relevant work, the burden shifts to the

Commissioner to establish at step five that the claimant can perform work available in the national economy. 20 C.F.R. § 404.1520(e) and § 416.290(e); *see also Yuckert*, 482 U.S. at 141-42, 144.

If the claimant cannot do the work he or she did in the past, the Commissioner must consider the claimant's RFC, age, education, and past work experience in determining whether the claimant can do other work in the national economy. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the testimony of a vocational expert (VE) or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).

If at step five the Commissioner establishes that the claimant can do other work which exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566. Conversely, if the Commissioner determines the claimant unable to adjust to any other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(g); *see also Lockwood*, 616 F.3d at 1071; *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).

**B. The ALJ's Findings in this Case**

In the present case, the ALJ applied the five-step sequential evaluation process and found, as step one, that Plaintiff had not engaged in substantial gainful activity since her application date of March 25, 2011. (AR 16.)

At step two, the ALJ found it was established that Plaintiff suffered from the following severe impairments: status postoperative prosthetic aortic valve replacement surgery; degenerative disc disease of the lumbar spine; blindness in the left eye; bilateral hearing loss; and obesity. (AR 16.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed Impairments. (AR 17.)

At step four, the ALJ found Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), except she is: limited to occasional stooping, bending, crouching, and crawling; limited to occasional climbing ramps and stairs, and never climbing ladders, ropes, and scaffolds; to avoid concentrated exposure to extreme heat and cold, noise, vibration and

pulmonary irritants; to avoid all hazards; and she is limited to occupations that require only monocular vision and those that do not require fine hearing capability. (AR 17.)

The ALJ took testimony from a VE, who testified that given Plaintiff's RFC, age, education and work experience, she could not return to her past relevant work as a warehouse worker because the demands of that work exceeded her RFC. (AR 20.)

At step five, the ALJ considered Plaintiff's RFC, age (43, defined as a younger individual under 20 C.F.R. 416.963), education (limited, but able to communicate in English), and work experience in connection with the Grids. (AR 20-21.) Since Plaintiff did not have the RFC to perform the full range of light work, the ALJ could not utilize the Grids to find Plaintiff was not disabled. (AR 21.) Therefore, the ALJ asked the VE whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience and RFC. (AR 21.) The ALJ testified that given all of these factors, Plaintiff would be able to perform the requirements of representative occupations such as: a small products assembler (Dictionary of Occupational Titles (DOT) 739.687-030); and masker (DOT 715.687-086). (AR 21.) Based on this testimony, the ALJ concluded that Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy and is not disabled. (AR 21.)

**C. Plaintiff's Credibility**

**1. Standard**

"[A] claimant's credibility becomes important at the stage where the ALJ is assessing residual functional capacity, because the claimant's subjective statements may tell of greater limitations than can medical evidence alone." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001) (citing SSR 96-7p (1996)). Thus, a claimant's credibility is often crucial to a finding of disability. The ALJ is responsible for determining credibility. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 750; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).

In general, when deciding to accept or reject a claimant's subjective symptom testimony, an ALJ must engage in two steps: (1) an analysis under *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir. 1986) (the "*Cotton* test"), and (2) an analysis of the credibility of the claimant's testimony

1  regarding the severity of his or her symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir.

2  1996); *see also* 20 C.F.R. § 404.1529 (adopting two-part test).

3  First, under the *Cotton* test, a claimant who alleges disability based on subjective

4  symptoms "must produce objective evidence of an underlying impairment 'which could

5  reasonably be expected to produce pain or other symptoms alleged.'"  *Bunnell v. Sullivan*,

6  947 F.2d 341, 344 (9th Cir.  1991) (en banc) (citing 42 U.S.C. § 423(d)(5)(A)); *see also  Berry v.*

7  *Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010)*; Lingenfelter v.  Astrue*, 504 F.3d 1028, 1036

8  (9th Cir. 2007). The test "imposes only two requirements on the claimant: (1) [he or] she must

9  produce objective medical evidence of an impairment or impairments; and (2) [he or] she must

10  show that the impairment or combination of impairments *could reasonably be expected to* (not

11  that it did in fact) produce some degree of symptom." *Smolen*, 80 F.3d at 1282 (emphasis

12  original); *see also* 20 C.F.R. § 404.1529(a)-(b).

13  "Second, if the claimant meets the first test, and there is no evidence of malingering, the

14  ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

15  specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036 (internal

16  quotation marks and citation omitted); *see also Valentine v. Comm'r of Soc. Sec. Admin.*,

17  574 F.3d 685, 693 (9th Cir.  2009). "This is not an easy requirement to meet: 'The clear and

18  convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759

19  F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).[3]

20  An ALJ's credibility findings are entitled to deference if they are supported by substantial

21  evidence and are "sufficiently specific to allow a reviewing court to conclude the adjudicator

22

23  [3]  The Commissioner argues in a footnote that despite the Ninth Circuit authority requiring clear and
convincing reasons for rejecting a claimant's testimony, this is more than what is required under the deferential

24  substantial evidence standard prescribed by Congress. (Docs. # 14/15 at n. 1.) Nevertheless, the Commissioner
contends the ALJ did set forth clear and convincing reasons for discrediting Plaintiff in this case. The Ninth Circuit

25  confirmed, as recently as July 14, 2014, that where there is no evidence of malingering, an ALJ must provide
"specific, clear and convincing reasons" for rejecting a claimant's testimony regarding the severity of her symptoms.

26  *See Garrison*, 759 F.3d at 1015 (citing *Smolen*, 80 F.3d at 1281; *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th
Cir. 2006)). Not only did the Ninth Circuit confirm this standard applies, as stated above, it elaborated that "[t]his is

27  not an easy requirement to meet," and in fact, "is the most demanding required in Social Security cases." *Id.* (quoting
*Moore*, 278 F.3d at 924). Therefore, the court rejects the Commissioner's contention that some lesser standard

28  applies when an ALJ rejects a claimant's symptom testimony (in the absence of evidence of malingering). The court
will discuss, *infra*, whether the ALJ did give specific, clear and convincing reasons supported by substantial
evidence in the record for rejecting Plaintiff's symptom testimony.

rejected the claimant's testimony on permissible grounds and did not 'arbitrarily discredit a claimant's [symptom] testimony.'" *Bunnell,* 947 F.2d at 345 (quoting *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991)). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Berry*, 622 F.3d at 1234 (internal quotation marks and citation omitted).

An ALJ may consider various factors in assessing the credibility of the allegedly disabling subjective symptoms, including: daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate symptoms; treatment, other than medication, received for relief of symptoms; any measures a claimant has used to relieve symptoms; and other factors concerning functional limitations and restrictions due to symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

When analyzing credibility, an ALJ may properly consider medical evidence in the analysis; however, the ALJ may not reject subjective pain testimony "on the sole ground that it is not fully corroborated by objective medical evidence[.]" *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (holding ALJ properly determined credibility where claimant's testimony was contradictory to and unsupported by objective medical evidence).

### 2. Plaintiff's Testimony

Plaintiff testified that she stopped working in 2001 because she was laid off. (AR 31.) At that time, she had been working part time at a store for vocational rehabilitation where she cleaned products, stocked shelves and straightened up the book area. (AR 31.) She worked four hours a day, five days a week. (AR 31.) She had problems with her duties there, including breathing the chemicals in the cleaning products, and she had a hard time getting up and down and walking back with the books. (AR 31.)

Plaintiff asserted she did not believe she was able to work because she has chest pain every day and back pain almost every day which make it hard for her to walk and sit. (AR 31.) She also testified she cannot work because she has arthritis in her hands, and has difficulty

writing. (AR 32.) She has hearing loss; she has a hearing aid in her left ear, and was waiting for approval from Medicaid to have surgery to place a hearing aid in the right ear. (AR 32.)  She cannot see out of her left eye and has a hard time seeing far distances with her right eye. (AR 32.)

She believes her chest pain is caused by her heart, and the pains come and go. (AR 34.) She wakes up with chest pain on occasion, but also gets them when she sits down to relax, and when she walks her son to school (approximately four blocks away, every morning). (AR 34.) She experiences shortness of breath while walking or when she exerts herself. (AR 34.)

She had surgery in June 2008, to replace her aortic valve. (AR 34.)

She has a sharp pain in her back which radiates to her leg, which makes it difficult to stand up and sit. (AR 35.) This occurs every few days, and sometimes every day. (AR 35.) She received injections in her back in 2004 and 2005, but has had no other treatment. (AR 35.) She does take pain medication that sometimes helps her back pain. (AR 35-36.) She is supposed to take Morphine twice a day, but it makes her sleepy. (AR 36.) She does not take it as prescribed. (AR 36.)

She has to sit down after standing to do the dishes or vacuuming for ten to fifteen minutes. (AR 36.) She cooks, but puts a chair in the kitchen so she can sit down. (AR 36.) These tasks cause her to get short of breath and her back to hurt. (AR 36.) When she goes to the grocery store (once a month) she leans on the basket, and has someone with her to get items on the bottom shelves and to load things into the vehicle because it hurts to bend over or squat. (AR 37, 39.) She is in pain for four to five days after her grocery shopping day. (AR 39.)

She does laundry, cooks and helps her youngest child with his homework; and her older children help her with chores around the house. (AR 37-38.)

She does not normally have problems sitting, except when she is hurting really bad, and then she has to lie down, which she says occurs every day for an hour, sometimes two, at a time. (AR 38.) She can sit for fifteen to twenty minutes before she gets stiff and hurts, and then she has to get up and walk around. (AR 38.) She does not have problems standing all the time, and can stand for a half hour to forty-five minutes at a time before her ankles, knees and lower back start

to bother her. (AR 39.) Her ankles, right foot, knees, hips and lower back hurt when she walks. (AR 39.) She can walk for an hour to an hour and a half before she has to stop or sit down. (AR 39.) Her doctors have only said that it could be the beginning of arthritis, but have done nothing to verify this. (AR 39.)  She gets short of breath going up stairs, and her knees, ankles and hips hurt going up and down stairs. (AR 40.) It hurts her back to lift items, but she can lift thirty pounds once an hour. (AR 40.) She gets muscle spasms in her lower back and legs once or twice a week. (AR 40.)

To alleviate her pain, she takes a hot bath and will sometimes use an ice pack and a heating pad on her lower back and knees, which provides her with some relief. (AR 41.)

**3. ALJ's Findings**

First, the ALJ recounted Plaintiff's testimony. (AR 17-18.) Next, the ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, the ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with her RFC. (AR 18.)

The ALJ said that the frequency and intensity of Plaintiff's subjective complaints of back pain, chest pain, and shortness of breath are disproportionate to the clinical and objective medical evidence of record. (AR 18.) In addition, the ALJ stated that Plaintiff testified she had difficulty with her hands because of arthritis, but October 2011 x-rays taken of the hands were relatively normal, with no significant arthritic changes. (AR 18.) The ALJ concluded that these inconsistencies suggest the information provided by Plaintiff may not be entirely reliable or she may be magnifying or exaggerating her symptoms. (AR 18.)

The ALJ noted that Plaintiff underwent aortic valve replacement therapy in June 2008, and was doing very well postoperatively. (AR 18.) Dr. Mito, Plaintiff's primary care physician, treated her postoperatively with anticoagulation therapy. (AR 18.) When her cardiologist, Dr. Berndt, evaluated her in March 2011, he reported she was stable and asymptomatic. (AR 18.) She denied palpations, shortness of breath and syncope, and had only occasional chest pain in the morning, not related to activity. (AR 18.) No changes were made to her treatment plan. (AR 18.)

1      A March 2010 chest x-ray showed postsurgical changes without evidence of acute

2 cardiopulmonary disease. (AR 18.) An April 2011 study showed no evidence for deep venous or

3 superficial thrombosis. (AR 18.) An October 2011 chest x-ray was likewise normal. (AR 18.) A

4 December 2011 echocardiogram was relatively normal. (AR 18.)

5      The ALJ indicated that Plaintiff was treated symptomatically for complaints of

6 intermittent back pain and occasional pain radiating to the lower extremities. (AR 18.) Dr. Mito

7 prescribed her narcotic pain medication and muscle relaxants. (AR 18.) She was diagnosed with

8 mild scoliosis and lumbar degenerative disc disease. (AR 18.) There is no evidence Plaintiff ever

9 participated in physical therapy, or was evaluated by an orthopedist or neurosurgeon. (AR 19.)

10      The ALJ acknowledged Plaintiff had moderately severe bilateral hearing loss, worse in

11 the left ear than the right, and that she was diagnosed with left eye blindness, and mild obesity.

12 (AR 19.)

13      Next, the ALJ discussed Dr. Gerson's consultative physical examination of Plaintiff in

14 August 2011. (AR 19.) She presented with chief complaints of back pain and chest pain.

15 (AR 19.) Plaintiff reported nonspecific pain in the midline thoracic and lumbar spine and in the

16 paravertebral muscles, but had full range of motion of the lumbar spine. (AR 19.) She had

17 minimal scoliosis. (AR 19.) She reported nonspecific pain and decreased vibration sense in the

18 left leg form the hip to the ankle. (AR 19.) She had limited range of motion of the left hip.

19 (AR 19.) She reported subjective pain in the knees and left ankle. (AR 19.) Her gait was with a

20 minimal limp, and her weight bearing and posture were normal. (AR 19.)

21      The ALJ then provided a review of the findings of the State agency medical consultants.

22 (AR 19-20.)

23      The ALJ found Dr. Gerson's and the State agency consultants' opinions to be supported

24 by the medical evidence of record, and accorded them great weight. (AR 20.) The ALJ did,

25 however, impose further limitations than Dr. Gerson on Plaintiff's ability to lift, and added

26 limitations regarding temperature extremes, vibrations, pulmonary irritants, hearing and vision in

27 making the RFC determination. (AR 20.)

28 ///

### 4. Analysis

Here, the ALJ found that there was objective evidence of an underlying impairment which could reasonably be expected to produce the symptoms alleged; therefore, the court must determine whether the ALJ offered "specific, clear and convincing reasons" that are supported by substantial evidence for rejecting Plaintiff's testimony about the severity of her symptoms. *See Garrison,* 759 F.3d at 1015 (citing Smolen, 80 F.3d at 1281; *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)); *Bunnell,* 947 F.2d at 345.

The Commissioner argues that the ALJ set forth five legally sufficient reasons for finding Plaintiff's symptom testimony less than credible: (1) Plaintiff's subjective complaints were disproportionate to the mild clinical and objective medical evidence of record; (2) Plaintiff testified that she stopped working because she was laid off rather than for reasons related to disability; (3) Plaintiff had a poor work history; (4) Plaintiff's treating physician contradicted Plaintiff's allegations; and (5) Plaintiff engaged in routine and conservative treatment. (Docs. # 14/15 at 5.) Of these reasons proffered by the Commissioner, the court finds that only the first, fourth, and fifth are actually supported by what is set forth in the ALJ's decision. As stated, *supra,* the court may not affirm the ALJ on a ground upon which the ALJ did not rely. *See Garrison*, 759 F.3d at 1010.

The ALJ specifically stated that Plaintiff's testimony regarding "[t]he frequency and intensity of the claimant's subjective complaints of back pain, chest pain, and shortness of breath are disproportionate to the clinical and objective medical evidence of record." (AR 18.) In addition, the ALJ's comments can reasonably be read to imply that Plaintiff's allegations were contradicted by her treating physician and that she engaged in routine and conservative treatment. (AR 18-20.) The ALJ's opinion does not, however, indicate or otherwise imply that Plaintiff's testimony was being discredited because she stopped working because she was laid off or because she had a poor work history. The ALJ recounted Plaintiff's testimony that she last worked in 2011, where she cleaned, stocked and straightened shelves, four hours a day, five days a week (AR 17), but the ALJ does not mention that she stopped working because she was laid off or anything else about her work history. Therefore, the court will only consider whether the

1    reasons actually set forth by the ALJ for discrediting Plaintiff's testimony are supported by

2    substantial evidence in the record.

3        Contrary to Plaintiff's argument, the court finds the ALJ's reasons are in fact supported by

4    substantial evidence in the record. Plaintiff argues that the ALJ did not provide legally sufficient

5    reasons for discrediting her testimony, but then focuses on only one statement by the ALJ

6    concerning an x-ray of her hand, which the ALJ described as "relatively normal." (Doc. # 13 at

7    9.) This is only one of the statements the ALJ made that serves as a basis for discrediting

8    Plaintiff's testimony. This reason, along with the others given by the ALJ, is supported by

9    substantial evidence in the record. Moreover, as the Commissioner points out, to be found

10    disabled, the ALJ must find at step two that the claimant suffers from an impairment or

11    impairments that are "severe", *i.e.*, that significantly limit the claimant's physical or mental

12    ability to do basic work activities. The x-ray of Plaintiff's right hand taken in October 2011

13    revealed only "minimal" spurring, and the other joints and alignment were normal. (AR 661.)

14    She was assessed with "mild" degenerative joint disease. (AR 661.) These results support both

15    the Commissioner's conclusion that Plaintiff's hand issue was not a "severe" impairment, and that

16    Plaintiff's complaints are disproportionate to the clinical evidence.

17        The ALJ's determination that Plaintiff's subjective complaints were disproportionate to

18    clinical findings; were contradicted by her physician's; and that she underwent conservative

19    treatment are likewise supported by substantial evidence in the record.

20        With respect to her back pain, Plaintiff complained about this issue when she established

21    with Dr. Mito on November 23, 2009. (AR 380-81.) Several weeks later, on December 3, 2009,

22    she went to the emergency room complaining of back pain. (AR 451-52.) She reported that

23    Dr. Mito had just recently given her a prescription for Darvocet. (AR 451.) She was diagnosed

24    with acute sciatica and was given a shot of Dilaudid and prescription for Percocet, and was

25    advised to follow up with Dr. Mito. (AR 452.) She saw him on December 22, 2009, and was

26    prescribed Flexeril as needed for muscle spasms. (AR 378-79, 561.) When she saw him again on

27    December 31, 2009, it was indicated she was doing well on her medications and had no new

28    problems, and normal range of motion and reflexes. (AR 377.) An x-ray of the lumbar spine on

1    March 30, 2010, revealed mild dextroconvex scoliosis of the upper lumbar spine with some

2    compensatory curvature of the lower lumbar spine; disc space narrowing at L2-3, L3-4, L4-5 and

3    L5-S1; associated facet joint arthropathy; and the pendicles appeared somewhat short and there

4    may be some central canal stenosis. (AR 391.) When she next saw Dr. Mito on April 5, 2010, no

5    new problems or concerns were noted and she had normal range of motion. (AR 373.)  The same

6    was true on April 26, 2010, where she was described as "doing well." (AR 368-69.) She had

7    normal range of motion and reflexes and no new complaints when she saw him again on June 7,

8    2010, and then on July 13, 2010. (AR 365-68.) She reported no new problems on August 17,

9    2010. (AR 363.) She indicated she was walking regularly and had no new complaints on

10   September 29, 2010. (AR 362.) She reported taking less of her pain medication on October 19,

11   2010. (AR 361.)

12        When she presented to the emergency room for other issues on November 19, 2010, it

13   was indicated that her back was non-tender with no guarding, and she had a full range of motion.

14   (AR 445-47.) She had normal range of motion and reported no new problems when she followed

15   up with Dr. Mito on November 22, 2010. (AR 359-60.) She had normal range of motion and

16   reflexes when she saw him next on February 15, 2011. (AR 357-58.) An x-ray of the cervical

17   spine from February 16, 2011, was unremarkable. (AR 546.) She had a normal physical

18   examination with Dr. Mito on March 22, 2011. (AR 486.)

19        When Plaintiff saw Dr. Mito on April 26, 2011, she reported that the pain she had in her

20   right leg starting in her back had resolved and only came occasionally. (AR 564.) She had been

21   prescribed oxycodone as needed for pain. (AR 559.) She underwent a right lower extremity

22   venous duplex study on April 29, 2011, related to right lower extremity pain. (AR 644.) There

23   was no evidence of deep vein thrombosis or superficial venous thrombosis. (AR 644.)

24        Dr. Mito noted decreased range of motion in the lower extremities when Plaintiff was

25   seen on May 12, 2011 (AR 564), and she was subsequently prescribed Flexeril and oxycodone.

26   (AR 577-78.) An x-ray of the lumbar spine taken on July 26, 2011, revealed mild to moderate

27   degenerative disc disease and facet arthropathy, most prominent at L5-S1. (AR 581.)

28        As the ALJ indicated, Plaintiff did not undergo physical therapy, or treat with a specialist

relative to her back pain, and instead underwent a course of conservative treatment consisting of pain medication to deal with her back pain. Most of the notations in the record indicate that when Plaintiff followed up with Dr. Mito, she had no new problems or complaints. This is consistent with a conclusion that Plaintiff was responding favorably to conservative treatment of medication, which undermines Plaintiff's testimony concerning her back pain. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039-40 (9th Cir. 2008) (upholding ALJ's decision where one of reasons for discrediting claimant's testimony was that Tommasetti responded favorably to conservative treatment). In the context of her relevant medical file, the notations regarding her back pain are few, and none are consistent with the degree of frequency and intensity which Plaintiff described in her testimony before the ALJ. This support's the ALJ's conclusion that Plaintiff's symptom testimony was disproportionate to the clinical findings.

With respect to her chest pain, Plaintiff presented to the emergency room on January 6, 2007, complaining of shortness of breath. (AR 478-79.) She was treated with a nebulizer and steroids and improved considerably, but was admitted to rule out pulmonary embulous and cardiac causes. (AR 479.) An echocardiogram revealed severe aortic insufficiency and mild mitral regurgitation. (AR 480-82.) Plaintiff then started seeing cardiologist, Dr. Berndt. (AR 300-01.) She reported shortness of breath after climbing one or two flights of stairs, and occasional chest pain lasting ten to fifteen minutes. (AR 301.) She was assessed with shortness of breath and chest pain, likely related to myocardial and valvular heart disease, and possible associated coronary disease, and fairly severe aortic regurgitation. (AR 300.) She was advised to continue dietary measures, stay clean from methamphetamine, get repeat panels and an echocardiogram, to make a decision about cardiac care. (AR 300.) Plaintiff underwent an echocardiogram on April 4, 2007, which showed left ventricular enlargement that was moderately severe; mild global hypokinesia; mild degenerative disease of the aortic and mitral valves; moderate aortic regurgitation; and abnormal left ventricular relaxation. (AR 342.)

She saw Dr. Berndt again on April 27, 2007, who discussed aortic valve replacement with her, and ordered testing. (AR 298.) Plaintiff saw Dr. Berndt on June 8, 2007, for medication monitoring. (AR 297.) She was "[l]eading a fairly active life, raising four children" doing "light

1   to moderate housework," with "dyspnea with moderate exertion." She reported rare left

2   parasternal non-radiating chest discomfort, of seconds in duration, not related to anything

3   specific other than maybe skipping some of her medications. (AR 297.) Her medications were

4   adjusted, and the issue of coronary angiography would be re-addressed in the future, which

5   might rule out coronary artery disease. (AR 297.)

6       Plaintiff saw Dr. Berndt on June 20, 2007, to discuss test results. (AR 296.) She reported

7   doing light house work, as she was limited by shortness of breath and low back pain. (AR 296.)

8   A nuclear myocardial stress test revealed no perfusion abnormalities. (AR 296.) She was advised

9   to continue her medications. (AR 296.) Dr. Berndt stated: "Given the fact that there is only

10  moderate aortic regurgitation and apparent improvement on current drug regimen will hold off

11  on aortic valve surgery." (AR 296.)

12      Plaintiff was seen by Sharon Mattioli, R.N., A.P.N., in Dr. Berndt's office on

13  September 11, 2007, for reevaluation of her cardiovascular status with cardiomyopathy.

14  (AR 293-95.)  She was "doing very well." She reported some chest pain with exertion and when

15  at rest, lasting from seconds to a couple of minutes, which goes away when she sits down.

16  (AR 293.) She reported some shortness of breath. (AR 293.) She was encouraged to increase her

17  walking and to continue her medications. (AR 294.) Her aortic valve would continue to be

18  monitored for possible surgery needs. (AR 294.) She was advised to follow up in two to three

19  months. (AR 294.)

20      Plaintiff saw Dr. Berndt on April 11, 2008. (AR 290-92.) She was described as leading "a

21  fairly active life," taking care of four children and her husband, and doing "moderate" household

22  activities. (AR 290.) She complained of shortness of breath with moderate exertion, but no

23  syncope or lightheadedness. (AR 290.) She reported occasional left upper anterior "sharp" chest

24  pain, which lasted seconds to minutes, not related to anything specific. (AR 290.) Dr. Berndt

25  stated that she "overall continues to do fairly well." (AR 292.) He noted significant aortic

26  regurgitation. (AR 292.) He advised that she have a follow up echo Doppler of the heart as well

27  as blood screening and was to follow up. (AR 292.)

28      On April 30, 2008, she denied palpitations or shortness of breath. (AR 288.) She was

described as stable from a cardiac standpoint. (AR 289.) On May 22, 2008, she reported shortness of breath with mild to moderate exertion. (AR 283.) Dr. Berndt described her as having "wide open aortic regurgitation with mild to moderate left ventricular systolic dysfunction" and was "probably cardiac class II." (AR 285.) He advised she visit with a heart surgeon to discuss possible aortic valve replacement. (AR 285.) In the meantime she was to continue her medications and follow up. (AR 286.)

Plaintiff had aortic valve replacement on June 26, 2008. (AR 454-56.) She was noted as doing well, three days post-surgery. (AR 455.) She saw Dr. Berndt for a follow up on July 14, 2008. (AR 279-82.) He said she was doing well postoperatively. (AR 279.) Her medications were adjusted. (AR 279.) She continued to have chest discomfort at the surgical site, but denied shortness of breath and said she was feeling better every day. (AR 279.) She was described as "stable from a cardiac standpoint" and was advised to continue with her medication regimen. (AR 281.) When she saw Dr. Berndt again on August 22, 2008, she reported feeling "great," although she still had some mild chest discomfort and shortness of breath but it was much improved. (AR 275.) Dr. Berndt described her as "doing very nicely." (AR 277.)

On January 2, 2009, she was described as stable and denied shortness of breath. (AR 271.) She had rare chest pain, unrelated to physical exertion. (AR 271.) Dr. Berndt said: "[t]his lady cardiac-wise is doing well and stable. Her chest pain sounds like it is musculoskeletal we noted." (AR 274.) "We know that her coronary arteries are normal. She does not appear to have any overt pericardial disease. Her aortic valvular prosthetic device appears to functioning fairly normally, she has minimal perivalvular leak." She was advised to continue her current medications and follow up in six months. (AR 274.)

On April 28, 2009, she reported some chest pain, but was described as stable and Dr. Berndt said her chest pain was most likely related to musculoskeletal pain. (AR 270.) She was urged to take Tylenol for relief. (AR 270.) When she saw Dr. Berndt again on December 29, 2009, she was stable and denied shortness of breath. (AR 263.) She experienced chest pain rarely, which was not necessarily related to physical exertion. (AR 263.) She was counseled regarding weight loss and instructed to monitor her blood pressure regularly. (AR 266.)

Regarding her aortic valve disorder, she was described as asymptomatic and no changes to her treatment plan were necessary. (AR 266.)

On January 15, 2010, she reported some chest discomfort, particularly while lying down which lasted from minutes to hours. (AR 259.) She had no shortness of breath or palpitations. (AR 259.) She was described as stable, and her chest discomfort was referred to as "atypical," with Dr. Berndt surmising it was "probably not cardiac with a reassuring angiogram." (AR 262.) On February 5, 2010, she continued to have some chest discomfort during the middle of the night, lasting ten minutes, but was not associated with any symptoms. (AR 255.) Dr. Berndt said this was "more than likely musculoskeletal in origin." (AR 258.)

On March 19, 2010, she reported occasional chest discomfort, but no shortness of breath or palpitations. (AR 217.) Dr. Berndt said she was stable from a cardiac standpoint and was advised to continue her medication. (AR 220.) On June 25, 2010, Dr. Berndt indicated she was stable and asymptomatic. (AR 213, 216.) On March 10, 2011, she reported occasional chest discomfort with certain body positions but denied shortness of breath and palpitations. (AR 209.) She had normal respiratory rhythm and a normal heart rate. (AR 211.) Dr. Berndt said she was asymptomatic and no changes were made to her treatment plan. (AR 212.) On March 23, 2011, she was stable with no palpitations or shortness of breath. (AR 205.) She had occasional chest pain in the morning, not related to activity. (AR 205.) She was in no acute distress, with normal respiratory rhythm and heart rate. (AR 207.) She was once again described as asymptomatic, and no changes were made to her treatment plan. (AR 207.)

The medical records reflect that following her aortic valve replacement, Plaintiff was consistently described by Dr. Berndt as stable or asymptomatic. While she reported occasional chest pain, it was generally not related to exertion, and was frequently described as occurring in the middle of the night or in certain body positions, was infrequent and did not last long. These facts are consistent with the ALJ's conclusion that Plaintiff's testimony regarding her subjective complaints of chest pain was disproportionate to her clinical findings and contradicted by her physician.

In sum, the court finds that the ALJ set forth specific, clear and convincing reasons

supported by substantial evidence in the record for discrediting Plaintiff's subjective symptom testimony. Therefore, it is recommended that Plaintiff's motion be denied, and the Commissioner's cross-motion be granted.

### IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Remand and/or Reversal (Doc. # 13) be **DENIED**, and that the Commissioner's Cross-Motion to Affirm (Doc. # 14) be **GRANTED.**

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.

DATED: April 14, 2015.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE